LOUISVILLE & N. R. CO. et al. v. RAILROAD COMMISSION OF ALABAMA et al.

(Circuit Court, M. D. Alabama. September 4, 1907.)

1. COURTS—JURISDICTION OF FEDERAL COURTS—SUIT AGAINST STATE.

A suit to enjoin the enforcement of a state statute fixing railroad rates on domestic shipments as confiscatory against state officers specially charged by such statute with the duty of its enforcement is not one against the state within the meaning of the eleventh constitutional amendment, and a federal court of equity which has acquired jurisdiction of such suit, and has not only granted a preliminary injunction, but has under authority given by the statute itself suspended its operation pending a final hearing, has power upon the filing of an amended bill to also enjoin the county solicitors and sheriffs from taking threatened action under such suspended statute, either by civil or criminal proceedings against employés of a railroad company, the effect of which would be to interfere with the operation of its road, and to obstruct both local and interstate commerce, and by which irreparable injury would be caused to the complainant.

[Ed. Note.—Federal jurisdiction in suit against state, see note to Tindall v. Wesley, 13 C. C. A. 165.]

2. INJUNCTION—SUIT TO DETERMINE CONSTITUTIONALITY OF STATUTE—SUSPENDING ENFORCEMENT.

A court of equity which has power to declare a statute unconstitutional may also, where its constitutionality depends upon controverted facts, and can only be determined on a hearing, suspend the operation of the statute in a proper case, to prevent irreparable injury, until the final hearing.

3. COURTS—JURISDICTION OF FEDERAL COURTS—STATE STATUTES.

The jurisdiction and powers of a federal court of equity cannot be affected by state legislation.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 13, Courts, §§ 795, 796.]

4. INJUNCTION—GROUNDS FOR PRELIMINARY INJUNCTION—THREATENED INJURY.

It is not a defense to an application for a preliminary injunction that defendants have not actually taken any action in the matter in which they are sought to be restrained, where the bill charges that they intend to and will take such action, unless restrained, and such allegation is not denied.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 27, Injunction, § 9.]

In Equity. On motion for preliminary injunction.

The Louisville & Nashville and other railroad companies filed their original bills here on March 30, 1907, against the Railroad Commission and Attorney

General of Alabama to restrain the enforcement of certain legislation fixing the maximum freight and passenger rates on intrastate business, which the defendants were under duty to enforce, and also to restrain the enforcement of the statute which ipso facto forfeits the right of complainants to do intrastate business, if they brought bills in the federal court to test the validity of the rate legislation. A preliminary injunction as prayed was issued May 8, 1907, the respondents making no resistance, and filing neither plea, answer, nor affidavit in contradiction of the sworn bills. At the same time the court under the authority of the state statute providing a judicial mode for the review of the rates and for the suspension of the rate legislation, pending final determination, made an order suspending the rate statutes until final hearing. The cases are reported Seaboard Air Line Railway Co. et al. v. Railroad Commission of Alabama et al. (C. C.) 155 Fed. 792. On the 14th of August, 1907, the Louisville & Nashville Railroad Company and the South & North Alabama Railroad Company obtained leave to amend their original bills. As both cases present the identical features, the report of the cases will be confined to the amended bill of the Louisville & Nashville Railroad Company, in which the amendment, so far as material to the present posture of the cases, is contained in the following paragraphs:

"Paragraph 27. Complainant further shows to your honor that in and by an order in said cause by this honorable court made on the 30th day of March. 1907, the rates prescribed by the several acts of the Legislature of the state of Alabama complained of in the bill of complaint in this cause have been suspended; that is to say, the rates prescribed by an act approved March 2, 1907, entitled 'An act to fix and establish maximum rates to be charged by railroads now operating or which may hereafter operate as common carriers in whole or in part in the state of Alabama for transportation, originating and terminating within the state of certain articles, and for this purpose to classify said articles and said railroads,' and by an act approved February 14, 1907, entitled 'An act to prescribe and regulate rates on all railroads, other than street railroads, carrying passengers between points within the state of Alabama,' and by an act of the state of Alabama approved February 9, 1907, entitled, 'An act to make the railroad rates of freight in force January 1, 1907, for the transportation, originating and terminating within this state, the maximum rates.' Said order further restrains and enjoins the original defendants in this cause from enforcing the observance of said several rates prescribed by said several statutes. and to that end restrains and enjoins the Railroad Commission of Alabama, Charles Henderson, president, William D. Nesbitt and John G. Harris, associate members, of the Railroad Commission, and each of them separately and individually, from putting into effect the maximum or other rates upon passengers prescribed and authorized by said act of the Legislature of Alabama approved February 14, 1907, and from putting into effect the maximum or other rates prescribed and authorized by said act of the Legislature of Alabama approved March 2, 1907, and from putting into force and effect the maximum or other rates prescribed by the act of the Legislature of Alabama approved February 9, 1907, so far as said rates or any of them so prescribed and authorized relate to the complainant's railroad or any part thereof within the state of Alabama, and from ordering, recommending, instituting, or bringing, or causing to be instituted or brought, through Alex M. Garber. Attorney General of the state of Alabama, or through any attorney or attorneys employed or appointed by themselves or any of them, or by any officer or officers of the state of Alabama, or through any person or persons whomsoever, any civil action or proceeding of any nature or kind whatever, or prosecution by indictment or otherwise against the complainant or any of its officers, agents, or employés, for damages, penalties, or fines, or for any cause whatsoever for failure to continue in force or effect complainant's tariffs or rates of January 1, 1907, or for charging, demanding, or receiving for the transportation of freight over complainant's railroad more than the tariff rates of freight in force upon complainant's railroad on January 1, 1907, and also from putting into force and effect upon any of said lines of railroad of complainant in Alabama the passenger tariffs or rates prescribed in said act approved February 14, 1907, and also from putting into force and effect the classification of freight and schedules of rates prescribed or authorized in said act of March

· 2, 1907, and also from instituting or bringing, or causing to be instituted or brought, any suit at law or in equity against complainant, or any officer, agent, or employé of complainant to put in force or effect or to observe the provisions ·of said act, approved February 9, 1907, or of the said act approved February 14, 1907, or said act approved March 2, 1907, and also from instituting or bringing, or causing to be instituted or brought, any suit or proceedings, either at law or in equity, civil or criminal, or any of its officers, agents, or employés, for failing to observe any of the tariffs or rates prescribed or authorized by said .acts, or either of them, or for charging more for passengers or freight transported than is provided or authorized by said acts or either of them, and also from instituting or bringing, or causing to be instituted or brought, any suit or proceedings, either at law or in equity, civil or criminal, for penalties ·or otherwise against complainant or any officer, agent, or employé of the com,plainant for having increased its prior to March 25, 1907, above the maximum of its schedules of freight charges of January 1, 1907, and in and by said order this honorable court further restrained and enjoined the original defendant, Alex M. Garber, Attorney General of the state of Alabama, and each and every .attorney at law that may be employed or appointed by said Railroad Commis:sion of Alabama, or by Charles Henderson, president, or William D. Nesbitt, .and John G. Harris, associate railroad commissioners of Alabama, or either of them, or by any other officer of the state of Alabama, and all individuals, persons, and corporations, were thereby enjoined and restrained from instituting or prosecuting against complainant or any of its officers, agents, or employés ·any action or proceedings, civil or criminal, for damages, penalties, or fines, ·or for any cause of action whatever for failure to continue or put into force or effect on any of the lines of complainant in Alabama any of said tariffs, passenger or freight, or for charging, demanding, or receiving for transportation of passengers or freight more than the rate or rates prescribed in said ·several acts of the Legislature·of Alabama, or any ,of them, or for continuing in the conduct of its business in the transportation of passengers and freight between points in the state of Alabama, notwithstanding the bringing by complainant of this suit in this court. It is the purpose and intention of his excellency, Braxton B. Comer, the Governor of the state of Alabama, to cause :said order of this honorable court to be frustrated and rendered ineffectual by requiring and instructing the various solicitors and other prosecuting officers in the several counties through which the complainant's railroads or any parts thereof are operated to cause complainant, its officers, agents, and employés, to be arrested, indicted, prosecuted, and imprisoned should they or either of :them, under the protection of the said order made by this honorable court, .and pursuant to its terms, charge, demand. or receive for the transportation of passengers or freight more than the several rates fixed by said several statutes, ·or either of them, or should they or either of them refuse to receive any article when offered for transportation at the rate of compensation established by :statute.

"Paragraph 28. His excellency, the said Braxton B. Comer, was at the time that the bill of complaint was filed in this cause the Governor of the state ·of Alabama, and is still such Governor, and as such Governor he is charged with the duty of seeing that the laws of the state of Alabama are enforced. He knows of the bill of complaint filed in this honorable court in this cause, and is familiar with the allegations contained therein, and also with the ob.ject and purposes thereof, and knows of the restraining order heretofore made by this honorable court in this cause, and 'of the terms thereof, and as the ·Governor of the state of Alabama he has employed special counsel to assist the defendant, Alex M. Garber, the Attorney General of the state, in defending the cause, and the Attorney General of the state of Alabama and said special counsel have appeared in said cause under such employment, and are representing the defendant herein; and yet his excellency, the said Braxton B. ·Comer, Governor aforesaid, has recently on various occasions and in varying language since the filing of the bill of complaint in this cause, and since said ,order suspending said rates and restraining said parties, and all other officials of the state as aforesaid, openly and publicly repudiated the right of this honorable court to make said order, and declared that said order does not ,operate to suspend the several rates fixed by said several statutes, and has

openly and publicly declared that the making of said order by this honorable court is in violation of the sovereign rights of the state of Alabama, and declared, in spite of the suspension of said rates by said order of this court in this cause, and the fact that the enforcement of said rates has been restrained and enjoined as aforesaid, that every time a railroad has, since said order was made, charged a greater rate than that prescribed by either of said acts, and its officers, agents, and servants by charging, demanding, or receiving such greater rates have committed a criminal offense, and that every time any such railroad or either of its officers, agents or servants hereafter makes such charge it and they are guilty of a criminal offense, and that for each of said offenses they, the said railroads, their officers, agents, and employés, should be arrested, indicted, convicted, and punished by the courts of the state, and that it is the duty of the solicitors and other prosecuting officers of the various counties in which any of said railroads, including that of the complainant, is operated, to indict and prosecute said railroads and their officers, agents, and servants for making said charges in excess of said rates, and that it is the duty of the several courts of the state of Alabama to convict and punish such railroads, their officers, agents, and servants therefor without regard to, or respect for, the order of this honorable court made in this cause suspending and restraining and enjoining the enforcement of the several rates prescribed by said several statutes, and he has openly and publicly declared his purpose to advise and instruct the several solicitors and other prosecuting officers in said several counties to ignore the said order of this court in this cause suspending and restraining and enjoining the enforcement of said rates, and to cause to be arrested, indicted, and prosecuted said several railroads, including complainant, and their officers, agents, and servants, for each charge made by them, or any of them, in excess of any of the rates prescribed by said several acts.  Among other things, his excellency, the said Braxton B. Comer, has declared that every time a ticket is sold for more than 2½ cents a mile the railroads violate the law, and the person selling the ticket commits a misdemeanor, and it is the duty of every court to so charge the jury, and the duty of every solicitor to make out a case.  *  *  *

"The Southern Railway Company filed in this court its bill of complaint, making allegations similar to that made by complainants in the above-entitled cause, and obtained from this honorable court a restraining order identical in purpose, effect, and scope with that obtained by complainant, in so far as said order relates to said freight and passenger rates and the suspension thereof, and in so far as said order restrains and enjoins the prosecution of the railroads for charging rates in excess of those prescribed by said order, but, after said order had been made, the Southern Railway Company agreed with his excellency, the said Braxton B. Comer, to put into force and effect on September 1, 1907, the rates prescribed by said several statutes pending said litigation, and, referring to said settlement, his excellency, said Braxton B. Comer, openly and publicly said, in substance: 'I think the Southern Railway management was very wise in accepting in good faith the recently enacted laws of the state, and give them a fair trial, and it is difficult to understand how any corporation, whether domestic or foreign, can see it for their business interest to place themselves crosswise of the expressed will of the people, and place themselves in defiance of the laws of the state, and seek by injunction of the federal court to place themselves outside of the sympathy of the laws of the state.  I wish to thank the Southern Railway officers for their accession to what I am sure is a just demand from the people, and agreement to obey our laws, and will simply add that a negro crap shooter would be arrested in a minute for any violation of the law, and I shall charge every officer of the state that any violation of our criminal laws, whether by individuals or trusts, no matter how small the individual nor how great the trust, is a violation of the law, and must be so charged and alike made amenable.  I am afraid that some of our public service corporations do not fully understand that Alabama is a sovereign state, and must dominate its intrastate affairs.  I am sure that there is scarcely a citizen of Alabama so scallawag in his views as to wish or help secure the contrary to this.  I am sure that the people of Alabama practically as a unit demand that the state shall govern its own affairs, and that whenever any of our laws, civil or criminal, are violated, the offender must pay

the penalty.' He further said, in substance, as follows: 'I can conceive of no greater mistake than for a public service corporation to attempt to ignore through an injunction of the federal courts the state's right to regulate their business within the state. I think it is a great mistake for the local federal courts to attempt to set aside the state's jurisdiction of its own affairs.'

"Paragraph 29. The complainant further shows to your honor that it is the purpose and intention of his excellency, the said Braxton B. Comer, in accordance with his said publicly expressed views, to instruct the said several solicitors and prosecuting officers in the several counties through which complainant operates its railroad, or any part thereof, to ignore and defy the order of this court in this cause suspending and enjoining the enforcement of said several freight and passenger rates, and to cause to be arrested, indicted, and prosecuted in their respective counties the complainant, its officers, agents, and servants, for every charge made, whereby a rate in excess of those prescribed by said statutes is demanded or received, and for every refusal by it or them, or any of them, to receive any article when offered for transportation at the rate of compensation established by statute, and that he so intended at and before the bill of complaint was filed in this cause, and that said several solicitors and other prosecuting officers will, under said instructions and directions, cause complainant, its officers, servants, and agents, to be arrested, indicted, and prosecuted for each of said charges or refusals, and that the sheriffs of each of said counties will, in person or through their deputies or assistants, arrest and imprison the officers, agents, and servants of complainant upon said charges or indictments, unless a further and additional order is made by this honorable court restraining and enjoining them from so doing. And complainant shows to the court that, by said several prosecutions, it will, in spite of the order heretofore made by this honorable court suspending and restraining and enjoining the enforcement of said rates, be compelled to desist entirely from doing any intrastate business in the state of Alabama pending this cause, unless it shall charge for the transportation of freight and passengers not more than the said several rates fixed by said several statutes, and in either of said events it will suffer and sustain irreparable loss and injury. * * *

"Complainant further states that many of its agents and servants at its stations on its lines in Alabama are telegraphers, and engaged daily and hourly in communicating by telegraph to other agents of complainant the facts concerning the movements and operations of freight trains carrying both intrastate and interstate traffic, and of passenger trains carrying both intrastate and interstate passengers, as well as the United States mails, and are engaged also in charging and receiving freight and passenger rates as allowed by the order of the court herein, as well as in the discharge of other necessary duties connected with the transportation of both intrastate and interstate commerce on such trains; and many of complainant's agents and servants are conductors on complainant's passenger trains which carry daily both intrastate and interstate passengers and said mails, and among their several duties is that of demanding and collecting cash fares of passengers who have failed to purchase tickets at the stations where they boarded such trains; and should complainant's said agents and servants be arrested from day to day and from time to time, and thus prevented from discharging their several duties to the public, as well as to complainant, and which they are employed by complainant to perform, as is threatened to be done by his excellency, said Braxton B. Comer, the public at large, as well as the complainant, will suffer and sustain great and irreparable loss and damage, and not only complainant's intrastate freight and passenger trains, but its interstate freight and passenger trains, as well as the United States mails, which are daily carried thereon, will be greatly delayed and interfered with, if not stopped altogether, and complainant will be thereby rendered unable to keep its said agents and servants in the discharge of their several duties, or to employ and keep in the discharge of their several duties other competent agents and servants to take the places and discharge the duties of those thus arrested at the instigation and under the instructions of his excellency, said Braxton B. Comer. * * *

"Complainant further states that, by reason of the arrest, indictment, and imprisonment of its officers, agents, and servants threatened and about to be done as aforesaid, its railroad properties in Alabama will be ruined and de-

stroyed, and the carrying of the United States mails and interstate commerce over its lines in Alabama will be prevented, unless the restraining order and injunction hereinafter prayed for be immediately granted."

The amended bill makes the sheriffs and prosecuting officers in each of the counties through which complainant's road is operated defendants to the bill, and prays that they be enjoined from instituting, "prosecuting, or aiding in the prosecution or causing to be prosecuted, any proceedings, civil or criminal, of any kind or description whatsoever against complainant, or against its officers, agents, or servants, or any of them, for or on account of the matters aforesaid, or for or on account of their violation, or the violation by complainant of the provisions of said several acts of the Legislature of the state of Alabama fixing the maximum rate upon passengers and freight transported between points in said state, or either of them, and causing them or any of them to be indicted or aiding in indicting them, and from causing them or any of them to be arrested or imprisoned, or otherwise detained, under any indictment or warrant or otherwise, for or on account of any charge based upon the violation or alleged violation by complainant or any of its officers, agents, or servants, of any of the terms of said several acts of the Legislature of the state of Alabama fixing the maximum rates upon passengers and freight to be transported between points in said state"; and also that the sheriffs and their successors in office and their deputies be enjoined "from executing or serving upon complainant or upon any of its officers, agents, or servants any summons and complaint, or other process in any civil suit or proceedings had or instituted during the pendency of this cause upon or against the complainant, its officers, agents, or servants, or either of them, and from, in any manner interfering with or molesting complainant, its officers, agents, or servants, or any of them, for or on account of the violation or alleged violation by them or any of them of any of the terms of the said several acts of the Legislature of the state of Alabama, and from arresting, taking into their custody, or the custody of either of them, or otherwise restraining or detaining the complainant, its officers, agents, or servants, or either of them, in the jail or jails of any of the counties of the state of Alabama, or elsewhere, under any warrant, indictment, or otherwise, for or on account of the violation or alleged violation by complainant, its officers, agents, or servants, or either of them, of any of the terms of the provisions of said several acts of the Legislature of the state of Alabama fixing the maximum rates upon passengers or freight transported between points in said state, or either of them, and restraining and enjoining the said last-named defendants, or their successors in office, and each of them, by themselves or their deputies, or the deputy or deputies of either of them, from demanding or collecting on execution or other process from complainant, its officers, agents, or servants, or either of them, any fine or penalty whatever, or any part thereof, inflicted or adjudged against them, or either of them, for any violation or alleged violation of any provision of the acts of the Legislature of Alabama, fixing or prescribing the maximum rates for freight or passengers transported between points in said state."

On the filing of the bill the court set the 24th day of August, 1907, for hearing the motion for an injunction pendente lite as to these matters, and in the meanwhile issued a restraining order as prayed. All the solicitors who appeared filed answers, which are verbatim copies of the answer filed by the solicitor of Bibb county, who objected to the relief asked against him on the following grounds:

"(1) There is no equity in the bill so far as the same seeks relief against him.

"(2) It would be a violation of the Constitution and statutes of the United States to grant the injunction prayed for against him, or to extend said injunction as prayed for to him.

"(3) It would be a violation of the eleventh amendment of the Constitution of the United States and also of section 15 of the Constitution of Alabama to maintain the bill as amended against him, or to extend the injunction prayed for, since the bill as amended, in so far as he is made a defendant thereto, is, under its averments, in reality a suit against the state of Alabama.

"(4) The court has no jurisdiction to restrain criminal prosecutions in the name of the state of Alabama, as the amended bill seeks to do.

"(5) The defendant is not specially charged by the state of Alabama, or by its statutes, with the execution of or with the performance of any special duty with reference to the several statutes, concerning railroad, freight, and passenger rates in the amended bill referred to, and hence he is not a proper defendant to said amended bill."

The sheriffs who appeared filed answers setting up verbatim the same objections as the solicitors. In view of the great excitement then prevailing in the state, the court deemed it best, in granting the orders, to discuss somewhat fully the principles by which it was guided in issuing them. The opinion thereon stated that heretofore the court had "necessarily" decided all the questions of law involved in the amended bills, and reserved all other questions until the coming in of the answer to the rule to show cause.

Gregory L. Smith, Geo. W. Jones, and H. L. Stone, for complainants.

Dent & Weil, P. H. Stern, and Coleman & Rushton, for defendants.

JONES, District Judge (after stating the facts as above). On the day set for the hearing of these motions, the Attorney General appeared; and, while avowing the highest respect for the court, and friendship for the presiding judge personally, expressed the opinion that the questions raised on the rule to show cause had been "prejudged" by the opinion rendered in granting the restraining orders, and therefore asked leave to withdraw any further appearance in this particular matter. Reciprocating the feeling of friendship and respect expressed by the Attorney General, the court freely granted his request, but verbally repelled from the bench, without unkind comment, the injustice of his position. The opinion on the granting of the restraining orders enunciated no view of the law which had not already been solemnly adjudged before in decisions made in these cases in 11 separate orders which were submitted to counsel, and to which they did not then object. Those orders enjoined threatened criminal prosecutions by state officers. The alleged threats by solicitors and sheriffs raised the same presumption that they would endeavor to enforce these laws as flows from the "special charging" of the respondents to the original bill with such a duty. It was also known to counsel that in Express Co. v. City of Ensley (C. C.) 116 Fed. 756, the presiding judge some years before had decided that a court of equity had undoubted authority to enjoin criminal prosecutions for the protection of a property right when imperiled by the execution of void statutes or ordinances. It was well known to everybody that the court prior to issuing these restraining orders had decided in an elaborate written opinion in these very cases that it had jurisdiction of the subject-matter, that it had the right to enjoin the criminal proceedings threatened, and that the suits were not suits against the state. Seaboard Air Line Railway Company et al. v. Railroad Commission et al. (C. C.) 155 Fed. 792. Moreover, in the opinion on the restraining orders against the sheriffs and solicitors, it was stated that the court had "necessarily" heretofore decided those questions, and all expression of opinion as to any new matters which might be raised by the answers was expressly pretermitted. Moreover, their answers were on file when the Attorney General asked to withdraw, and they did not attempt, even remotely, to raise any new questions. Every court is bound to follow its own decisions, if it deems them sound, until overruled by higher authority. Otherwise, there would be no certainty in the law.

If a subsequent case arises involving the principle applied in the prior case, the judgment in the prior case must necessarily control the subsequent case. This, as every one knows, is not "prejudgment" in any sense, either moral or legal, but merely the application to the case of the law as pronounced in the prior case. When a court has solemnly adjudged a principle of law, especially, as here, in other stages of the very case, it is not required by the subtlest obligation of even the most delicate rule of ethics to refrain from expressing adherence to its former decisions, in discussing further interlocutory orders it is called to make, because a party insists that the principle of the former decision was wrong, and insists on silence on the part of the court, when the question is again brought forward by way of rehearing, until reargument can be had. For some months after the bills were filed in this court to test the reasonableness of the rates there was acquiescence on all sides in the exercise of jurisdiction by the court, and a general disposition to treat the matter as a purely judicial question to be settled in the court. Subsequent events in North Carolina, however, quickly changed the situation, and set the pace for like action here. Accordingly numbers of officials who had participated in the discussions and the rewards of the hustings began to insist that the question was purely political, which had been finally decided at the polls, and that any inquiry upon the part of the courts into the justice of the legislation deserved savage denunciation as an invasion of the rights of the state and an unwarranted meddling with local affairs. Portions of the press incessantly re-echoed these cries. The Governor, in public utterances, insisted that state officials should disobey the orders of the court, and proceed to arrest and try the operatives of the various railroads on criminal charges in the state courts, if they did not immediately put in the rates prescribed by the statutes. Clashes of authority seemed imminent, and threatened widespread proportions and manifold evils. Under such conditions, it became the highest duty of the court to make public statement of its reasons for granting the restraining orders, and thus to destroy, as far as possible, the force of misrepresentations by which reckless agitators sought to bring the ignorant into collision with the authority of the court, and at the same time to call to the support of the law the sustaining power of a just public opinion, which would be increased and strengthened when taught how little real ground of complaint existed against the action of the court. Silence at such a time, in view of the evils to be averted by prompt appeals to the reason of men, would have been most culpable.

After the withdrawal of the Attorney General, the solicitor for Montgomery county, who expected to be represented by the Attorney General, obtained an adjournment and employed counsel, who very ably argued in support of the contention set up in the answers of the solicitors and sheriffs. These answers are, in effect, a plea to the jurisdiction, based upon the insistence that Fitts v. McGhee, 172 U. S. 516, 19 Sup. Ct. 269, 43 L. Ed. 535, applies to and controls the case made by the amended bill, and that it is a suit against the state in violation of the eleventh amendment. It is not necessary in order to sustain the jurisdiction here to critically analyze that case. If it be conceded to reach as far as respondents claim in the sweep of its influence, the doc-

trine in that case is in no way hostile to the principles upon which jurisdiction is maintained here. The original bill enjoined the enforcement of rates alleged to be confiscatory, which the defendants were specially charged with the duty of enforcing, was plainly not a suit against the state even under the doctrine of Fitts v. McGhee. The amended bill merely presents a case where the sheriffs and solicitors, in the language of that decision, "are about to commit some specific wrong" by enforcing the provisions of statutes which the original defendants had been enjoined from enforcing, and which had not only been attacked as confiscatory, and therefore enjoined pendente lite, but had also been suspended absolutely by authority of the state statute pending the hearing. There was no valid operative law upon which to base the threatened prosecutions. The restraining orders against the sheriffs and solicitors therefore fell with the very letter of the exception made in Fitts v. McGhee as to officers of the state who, under the authority of unconstitutional enactments, were committing "or about to commit some specific wrong or trespass to the injury of the plaintiff's rights."

A state statute, during the period of its suspension, can have no legal force whatever. It stands during its suspension as though it had never been, or had been declared unconstitutional. What is popularly known as "the outlaw statute"—the statute forfeiting complainant's right to do intrastate business if it brought suit to test the rates in a federal court—had already been declared unconstitutional, and the rate laws complained of had been formally suspended under the authority of the state statute, as well as the equity powers of the court, pending investigation of the facts which would determine whether the statutes could be treated as law at any time. No discretion whatever was vested in these officers to prosecute for violation of the suspended statutes, and the plain law of the land made it their duty not to attempt to do so. Yet, if they did so, they would unlawfully put state power in motion, and thus effect results, which, under Fitts v. McGhee and all other cases, they can be enjoined from accomplishing. There is a manifest distinction between Fitts v. McGhee and the present case in several most vital aspects: First. There was no state law in Fitts v. McGhee, as here, under which the owner of the bridge there could by bill in equity initiate litigation with representatives of the public to test the reasonableness of the toll, and by pursuing the mode the state law pointed out, not only bind every one by a decision in that one case, but, while the litigation was pending, could secure a suspension of the statute complained of, and thus destroy, pending final decision by the court in which the proceeding was brought, all basis of authority anywhere for any claim that the law had been violated by not observing a suspended statute. Second. In that case no court of competent jurisdiction, armed with power to determine "the very matter in dispute," had first obtained jurisdiction, and therefore enjoined prosecutions by indictment before any had been found in the state court, in order to prevent the transfer of the trial of the reasonableness of the rates to another forum, and thus acquired ancillary jurisdiction to prevent subsequent proceedings, in order to preserve the exclusive jurisdiction obtained by the commencement of the suit in the federal.

court. Harkrader v. Wadley, 172 U. S. 148, 19 Sup. Ct. 119, 43 L. Ed. 399; Taylor v. Tainter, 16 Wall. 366, 21 L. Ed. 287; Julian v. Central Trust Co., 193 U. S. 112, 24 Sup. Ct. 399, 48 L. Ed. 629. Third. That case did not involve, as does this, irreparable injury, both public and private, from the disturbance of the operation of a great inland highway of commerce by incessant arrests of the operatives and officers whose discharge of their duties at all times is absolutely essential to the movement of domestic and interstate commerce, and the prompt dispatch of the mails. The arrest of the tollkeeper in Fitts v. McGhee was hardly more than a private injury, and did not interfere in any way with the movement of domestic and interstate commerce, or impede the passage of the comparatively few persons or things using this local highway. The opinion in Fitts v. McGhee admits, as did the respondent to the original bill, that a suit against state officers, "specially charged" with the enforcement of an unconstitutional act, to prevent its enforcement, is not a suit against the state. That being the posture of the case on the original bill, Fitts v. McGhee is in no sense authority for the proposition that the proceeding is converted into a suit against the state when the bill is amended so as to reach other officers, not specially charged, but who threaten to enforce a statute, which is absolutely without legal virtue for the time being, and thereby work, without any warrant of law, irreparable injury and wrong to a property right. It stands to reason that the power which may arrest the agent specially charged by the state to carry out an illegal mandate, without overstepping the bounds of the eleventh amendment, does not run counter to that amendment when it enjoins an agent of less dignity, intrusted with no duty to the state, who attempts or threatens, without legal warrant, to destroy the property rights of the citizen, by putting the machinery of justice in operation to enforce an invalid statute.

The contention that a state officer cannot be restrained by injunction of the United States court from enforcing rate statutes by criminal prosecutions was overruled by the Supreme Court of the United States in Prout v. Starr, 188 U. S. 537, 543, 23 Sup. Ct. 398, 47 L. Ed. 584, and the same ruling was made in Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819. There can be neither criminal law nor duty to enforce it unless there be crime created by some valid operative law of the state. In Prout v. Starr, supra, the Supreme Court, referring to the insistence of the Attorney General of the state in that case that he "could not be restrained by injunction from enforcing the criminal laws of the state," said "that contention is only another phase of the same question," referring to its observations in another part of the opinion, where the court said:

"It would, indeed, be most unfortunate if the immunity of the individual states from suits by citizens of other states provided for in the eleventh amendment were interpreted so as nullifying other provisions of the Constitution which confer power on Congress, * * * all of which provisions existed before the adoption of the eleventh amendment, which still exist, and which would be nullified and made of no effect if the judicial power of the United States could not be invoked to protect citizens affected by the passage of state laws disregarging these constitutional limitations. Much less can the eleventh amendment be successfully pleaded as an invincible barrier to judicial inquiry

whether the salutary provisions of the fourteenth amendment have been disregarded by state enactments."

In the same opinion the Supreme Court refers to the case, among others, of Fitts v. McGhee as an example in which the judicial power of the United States has secured state immunity from suits in "proper cases." The Supreme Court there held that an injunction against the Attorney General of Nebraska to prevent prosecutions for to recover penalties for violation of a state rate statute did not present "a proper case" in which to apply the doctrine of Fitts v. McGhee, supra. It emphatically held that Fitts v. McGhee had no application whatever to such a case. In the case of Davis & Farnham Manufacturing Company v. Los Angeles, 189 U. S. 217, 23 Sup. Ct. 500, 47 L. Ed. 778, which is subsequent to Fitts v. McGhee, the Supreme Court says, without qualification it would seem:

"If there be jurisdiction in a court of equity to enjoin the invasion of property rights through the instrumentality of an unconstitutional law, that jurisdiction could not be ousted by the fact that the state had chosen to assert its power to enforce the statute by indictment or other criminal proceeding."

In the still later case of Dobbins v. Los Angeles, 195 U. S. 241, 25 Sup. Ct. 22, 49 L. Ed. 169, the Supreme Court declares:

"It is well settled that where property rights will be destroyed, unlawful interference by criminal proceedings under a void law or ordinance may be reached and controlled by a decree of a court of equity."

The same principle has been repeatedly declared by the state courts, and by none more emphatically than the Supreme Court of Alabama, in Port of Mobile v. L. & N. R. Co., 84 Ala. 115, 4 South. 106, 5 Am. St. Rep. 342; City Council of Montgomery v. L. & N. R. Co., 84 Ala. 127, 4 South. 626. See, also, Lottery Co. v. Fitzpatrick, 3 Woods, 222, Fed. Cas. No. 8,541; City of Hutchinson et al. v. Beckham et al., 118 Fed. 401, 55 C. C. A. 333; Central Trust Co. v. Citizens' S. R. Co., 80 Fed. 218.

This is unquestionably a case in equity. The court has jurisdiction, not only because it is a controversy between citizens of different states, but because the case involves the application of the Constitution and laws of the United States. If it be a case in equity, equity can undoubtedly administer its usual preventive remedies by injunction or otherwise, if necessary, to prevent a multiplicity of suits and irreparable injury pending final decree. The Supreme Court of the United States has declared that:

"The proper, if not the only, mode of judicial relief against the character of rates established by the Legislature, or by its commission, is by bill in chancery asserting their unreasonable character and their conflict with the Constitution of the United States, and asking a decree of the court forbidding the corporation from exacting such rates as excessive or establishing its right to enforce the rates as being within the limits of just compensation for the services rendered." Railway Co. v. Gill, 156 U. S. 649, 15 Sup. Ct. 484, 39 L. Ed. 567; Chicago R. R. Co. v. Minnesota, 134 U. S. 419, 10 Sup. Ct. 462, 33 L. Ed. 970.

Indictments for not observing the rates prescribed by statute would not settle the reasonableness or unreasonableness of the rate except in the particular case. The basic fact which furnishes the test of the rea-

sonableness of the rate is the value of the property devoted to the public use. In ascertaining this value, thousands of items of railroad property must be inventoried and valued. Next must be ascertained the proper cost of conducting the business, which involves an examination of books of account, and whether items of expense have been correctly charged, and whether items have been included in operating expenses which should have been charged to the capital account. A trial by jury of such issues is cumbersome, and would be long drawn out and expensive. A law court has not the proper machinery for conducting such investigations. One jury would find one way, and another jury another way, even on the same state of facts, according to the credence they gave to witnesses who testified before them. Public sentiment might be so strong in one locality that a jury would uphold as reasonable a rate, which, in another locality, another jury would pronounce unreasonable. The rates, if established by verdicts of juries, would vary, even on the same state of facts in the same locality. Carriers, shippers, and passengers would have no certain means of ascertaining their respective rights. If the carrier were indicted and acquitted in a given case, it would not be binding upon the state, upon the same state of facts, in another prosecution. For a noted case of great hardship, see Boyd v. Alabama, 94 U. S. 648, 24 L. Ed. 302. The number of prosecutions, if the carrier refused to put in a rate, would vary according to the intensity of feeling in particular localities, and a multitude of prosecutions would be instituted in the courts in different localities at the same time. Although the rates prescribed might be unreasonable, and their enforcement might amount to the taking of private property for public use without just compensation, the carrier would ordinarily be forced to observe these statutory rates rather than encounter the burdens and cost of resistance. If the loss to his business were so great that the exigency drove him to resist the enforcement of the rates, he would have to assume all these burdens, and, in addition, risk all on the hazard of the outcome, unless a court of equity can suspend the prosecutions pendente lite. Mindful of the irreparable injury and multiplicity of suits, which would be imposed upon the carrier if it resisted the enforcement of rates it considered unreasonable, and had no other mode of testing the reasonableness of rates than by meeting indictments as they are found, the Legislature of Alabama wisely provided a mode of settlement by bill in equity against the commission and the Attorney General, which in one suit would settle every question, and bind the state, the public, and the carrier alike, and authorized the court in the meanwhile to suspend the execution of the rate laws. This enabled the carrier upon properly indemnifying shippers and passengers to obtain a judicial ascertainment of its rights, without hazarding its whole estate upon the rightfulness of its challenge of the rates. Without some such provision, our rate laws would deter the carrier from going into court at all, and practically destroy its right to judicial review as effectually as if the statute had in so many words denied its right to resort to the court. Statutes making no such provisions as ours for contest of a right of property without risking such appalling loss would be unconstitutional, for the reasons given in the opinion of Justice Brewer in the Kansas City Stockyard Cases, 183

U. S. 79, 22 Sup. Ct. 30, 46 L. Ed. 92; Consolidated Gas Co. v. Mayer (C. C.) 146 Fed. 150; and therefore be rightly enjoined without regard to the reasonableness of the rates themselves. It is unnecessary to inquire at this time whether, under the doctrine declared in Gunter v. Atlantic Coast Line Ry. Co., 200 U. S. 275, 26 Sup. Ct. 252, 50 L. Ed. 477, the state has made itself a party by appropriating money, and authorizing the Governor to employ attorneys to defend the suit. However that may be, it is not material here. It is the state which the Constitution forbids to deprive any one of property without due process of law. A state cannot effect such results by the action of any one of its departments or all of them combined. A state can act only by and through its officers. It cannot impart to any of its officials a power which the state itself does not possess, nor by their action force results it is forbidden directly to accomplish. It may be "the king can do no wrong," but his ministers may be both controlled and punished. Whatever form the action of state officers may take or its legislation assume, regarding an admittedly lawful use of property, the state cannot so frame its laws, civil or criminal, or so regulate the action of its officers, as to put it beyond the power of a court of equity, on timely invocation of its jurisdiction, to preserve the property and property rights of the citizen pending final decree against irreparable injury, in consequence of the operation of laws which are, or may be ascertained to be, invalid. No one can in reason deny that a court which has the power to declare a statute unconstitutional may not also, where the constitutionality of the statute depends upon a state of proof which can be determined only after judicial inquiry and hearing upon controverted facts, likewise suspend the execution of the statute in a proper case to prevent irreparable injury, until it can be ascertained whether the statute constitutes the law of the land, and is therefore to be enforced, or is merely a transgression against the Constitution, and therefore to be condemned. United States v. Shipp, 203 U. S. 563, 27 Sup. Ct. 165, 51 L. Ed. 319. Otherwise the rights intended to be safeguarded by the "salutary provisions" of the fourteenth amendment would in many cases be destroyed before they could be determined in the courts, and would exist in name only. The form of state action is immaterial. It is the forbidden results to which the Constitution looks, and against which it provides. Prout v. Starr, supra. Mr. Justice Brewer in Reagan v. Trust Co., 154 U. S. 389, 14 Sup. Ct. 1047, 38 L. Ed. 1014, which case is reaffirmed in Smyth v. Ames, the latter being reaffirmed in Prout v. Starr, supra, which is later in point of time than Fitts v. McGhee, and is referred to therein, held that a suit against state officials acting under color of unconstitutional statutes, in a proper case, "where the remedy at law is inadequate, for an injunction to prevent such a wrong and injury," is not, within the meaning of the eleventh amendment, an action against the state. That is now the settled doctrine of the Supreme Court.

It is the veriest legal and moral misnomer to call an injunction against prosecutions about a rate charge an interference with "the power of the state to punish crime." The issue grows out of an admittedly lawful use of property in the transportation of persons and things, and in the performance of a duty the state exacts. The car-

rier has the legal right to charge the worth of the service. What the service is worth is a matter of honest difference of opinion. A certain charge or demand for the value of service rendered in the lawful use of property is by the statute made an offense. Insistence by the carrier upon the amount he claims as the just reward is not even a breach of the peace. The penalty for not observing the statute is imposed for the violation of a civil duty, due primarily only to the shipper or passenger. The offense is quasi penal at most. The penalty is prescribed to compel the property owner to forego the assertion of a disputed property right in the courts, in the first instance, as well as to force observance of the statute after it is ascertained that the property right claimed has no legal existence. Enjoining prosecution for such an offense until it can be ascertained whether an offense has, in fact, taken place, leaves open and untouched the whole broad domain of state power to legislate for the preservation of the peace, morals, health, welfare, and liberties of the people, and the protection of the revenue and dignity of the state government. Here the court has not only stopped the prosecutions under its equity power, but, under the express sanction of laws of the state, has suspended the operation of the statutes, pending ascertainment of the facts upon which their operative force must at any time depend. When the state's laws are suspended pursuant to authority given by its own laws, the state laws have been observed, not disregarded, even if the unwarranted concession be made that the judicial power, under the Constitution of the United States, could not in a case like this prevent the enforcement of the statutes pending final decree. One who is entitled to sue in the federal court may invoke its jurisdiction in equity whenever the established principles and rules in equity permit such a suit in that court; and he cannot be deprived of that right by any action of the state. Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819.

It is equally well settled that:

"Jurisdiction of the federal courts sitting as courts of equity is neither enlarged nor diminished by state legislation, though by it all differences in forms of action be abolished, and all remedies be administered in a single action at law, and so far, at least, as form is concerned, all distinction between law and equity be done away with, yet the jurisdiction of the federal courts sitting as courts of equity remains unchanged. We have repeatedly held that the jurisdiction of courts of the United States over controversies between citizens of different states cannot be impaired by the laws of a state which prescribe modes of redress in their courts, or which regulate the distribution of their judicial powers. If legal remedies are sometimes modified to suit the changes in the laws of the states and the practice of their courts, it is not so with equitable. The equity jurisdiction conferred on the federal courts is the same as that the High Court of Chancery in England possesses, is subject to neither limitation or restraint by state legislation, and is uniform throughout the different states of the Union. * * * That jurisdiction, as has often been decided, is vested as part of the judicial power of the United States in its courts by the Constitution and acts of Congress in execution thereof. Without the assent of Congress, that jurisdiction cannot be impaired or diminished by the statutes of the several states regulating the practice of their own courts. * * * Conceding it to be true, as stated by the learned judge, that the full relief sought in this suit could be obtained in the state courts in an action at law, it does not follow that the federal court sitting as court of equity is without jurisdiction. The inquiry rather is whether by the principles of common law and equity as distinguished and defined in this and the mother

country at the time of the adoption of the Constitution of the United States the relief here sought was one obtainable in a court of law, or one which the court of equity was competent to give." Mississippi Mills v. Cohn, 150 U. S. 204, 14 Sup. Ct. 75, 37 L. Ed. 1052.

The amended bill presents, as did the original bill, a case of threatened arrests, in many places and in a multitude of instances, of officers and operatives of railroads thousands of miles in length, which feed the commerce of the most important cities of the state and traverse its entire length. Thousands of the employés subject to threatened arrest are engaged at the same time alike in intrastate and interstate commerce, and in the delicate operation of handling and running hundreds of trains daily. If complainant's servants may be arrested wherever found, in any of the numerous counties which their roads traverse, wherever any one chooses to swear out a warrant, or procure an indictment, it would inflict untold harm upon every private and public interest which is served by the carriers in their business. Not only intrastate commerce, but the orderly transit of interstate commerce, both of passengers and freight, and the prompt carriage of the mails, would be disordered and delayed, and the usefulness of the railroads to the public, measured by the requirements of modern industry and the economic necessities of our people, in a large measure destroyed. The employer has a property right in the services of his workman in his business, so long as he is willing to serve. He may maintain an action against any one who entices his servant to leave him, or by force or fraud prevents the servant from doing the master's work, when that is the design of the interference with the workman. This right of the employer in the services of his workman is protected by the sanction of our criminal laws against the efforts of all persons to destroy the relation, so long as the master and his workman desire that it shall continue. The arrests here threatened, with the disasters we have pointed out, it is important to remember are to be made under a statute which has been declared unconstitutional, or under statutes the operation of which have not only been enjoined, under the equity powers of the court, but suspended under the authority given by the state statute itself pending investigation of the facts upon which their validity ultimately depends. There is now no more authority to prosecute for nonobservance of these suspended laws than there would be to indict for violation of a statute which had not taken effect when the indictment is found. The suspended laws have not now, and can never have, force and effect in the future until the suspension is abrogated by the tribunal to which is intrusted the power to suspend the laws. Every arrest under these statutes while they are suspended is therefore a trespass upon the rights both of the employer and the workman. These arrests are to be made to prevent the carrier from carrying on a business in a way which is lawful, at least during the period of suspension. They are threatened in order to coerce complainants to abandon a right to protection of writs of a court of competent jurisdiction which have been issued to prevent a multiplicity of suits, and irreparable injury pendente lite, and to break down and defy the authority of a court of the United States to administer the rights of parties in a suit of which it has jurisdiction according to the usual modes of pro-

cedure in equity. These arrests ought also to be enjoined because they would be efforts to transfer the very matters in dispute to some other court, and thus defeat the exclusive jurisdiction of this court. They ought to be enjoined for the further reason that, under the circumstances of these cases, the threatened arrests would be "endeavors" to "obstruct or impede" the due administration of justice in these very cases, in violation of a criminal statute of the United States. Under such circumstances, the attempt to justify such arrests under color of state authority or to use state power to effect them, and thereby to defeat and undermine the jurisdiction of the federal court, which had first obtained jurisdiction of the subject-matter and parties, is neither more nor less than an effort to make nullification and sedition respectable by lending them the name of the state of Alabama to accomplish their purpose in defiance both of the Constitution and laws of the state and of the United States. It would impute both bad faith and dishonor to the state to conclude it intended, notwithstanding the statutes had been suspended in the mode its laws provide, that carriers who had complied with the laws in that respect should nevertheless be treated as criminals during the period of that suspension.

The authorities are unbroken and numerous to the effect that in cases like this equity must intervene by its preventive remedies. Osborne v. Bank, 9 Wheat. 738, 6 L. Ed. 204; Davis v. Los Angeles, 189 U. S. 217, 23 Sup. Ct. 498, 47 L. Ed. 778; Dobbins v. Los Angeles, 195 U. S. 223, 25 Sup. Ct. 18, 49 L. Ed. 169; Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819; Reagan v. Trust Co., 154 U. S. 362, 14 Sup. Ct. 1047, 38 L. Ed. 1014; Detroit v. Detroit Citizens' Street Railway Co., 184 U. S. 368, 22 Sup. Ct. 410, 46 L. Ed. 592. As Story observes:

"If, indeed, courts of equity did not interfere in cases of this sort, there would be a great failure of justice in this country." Story's Eq. Jur. § 928.

There is no difference in the issue sought to be raised by the prosecutions asked to be enjoined and the issue pending in this court on the bill in equity as to these rates. They present the identical question. The same proof in either court will defeat or maintain the rate. No greater or less degree of proof is required in either. No proof can possibly be offered upon the trial of an indictment as to the rates which would not be competent evidence in a civil suit concerning them. A judgment either way in criminal prosecutions concerning them would not bind the state or the public. A judgment either way in the equity suit will determine the whole question as regards the state, the public, the customer, and the carrier. To quote the language of the Supreme Court:

"The same rights are involved in the civil and criminal cases, and the legal questions involved are the same."

See Harkrader v. Wadley, 172 U. S. 167, 19 Sup. Ct. 127, 43 L. Ed. 399, where the court, in declining to allow interference with the indictment in that case, puts its refusal upon the distinct ground that "the fallacy in the argument of the appellee in the present case is the assumption that the same right was involved in the criminal case in the state court and in the equity case in the federal court."

It is also to be observed that the indictment there asserted an offense against the law of the state, "the validity of which is not assailed." That the Supreme Court of the United States considered the very same question involved in the indictment for a violation of a rate law and a prior suit in equity to test it is obvious on perusal of its decision in Prout v. Starr, 188 U. S. 544, 23 Sup. Ct. 401, 47 L. Ed. 584, where it speaks of "an attempt to transfer the very matters that stood for judgment in the federal court to the state court by filing a bill in the matter." Such a course, it said, "might bring about conflict between those courts, and create the confusion so often deprecated by this court." Peck v. Jenness, 7 How. 612, 12 L. Ed. 841; Orton v. Smith, 18 How. 263, 15 L. Ed. 393.

These matters aside, respondents finally insist that they are in no wise bound by the direction of the Governor as to the institution of criminal proceedings and the arrest of persons for the violation of these statutes, and that, as no overt act has been charged against them, they cannot properly be made parties defendant to the amended bill. It is unnecessary to determine how far the solicitors and sheriffs would be bound by the directions of the Governor in this respect, but, assuming respondents' view of the law in this regard to be correct, it does not meet the case. It is true the amended bill sets up as matter of inducement, or as a motive for the threatened action of respondents, that the Governor has charged or will charge them to make the arrests and institute the proceedings; but the allegation is positive, after reciting the reasons for complainants' belief, that respondents "will cause complainants' officers, agents, and servants to be arrested, indicted, and prosecuted for said charges, refusals," etc. The respondents have been careful to refrain from any denial of what they purpose, notwithstanding it is positively charged that they will make the arrests, and put on foot the prosecutions. They know their own intentions. The answers of the respondents are identical, and their attitude is evidently directed by one mind. It is usual in matters of this kind, even where the action of private persons is concerned, when it is sought to defeat the issue of a preliminary injunction to disavow any intention, when it is positively charged, to override and defy the orders of the court. If such a disavowal be incumbent upon a private citizen under such circumstances, how much more is it requisite when the allegations concern the actions of a class of officers who are emphatically peace officers, bound by the highest moral and legal considerations to respect and obey the orders of the courts. The omission to enlighten the court on this point is not due to oversight or inadvertence. Under these circumstances, and in the light of matters of common knowledge recited in the amended bill, but of which the court may also take judicial notice, what is the only natural inference to draw from the answers, which challenge only the jurisdiction of the court to make the orders and carefully refrain from any disclaimer of intention to make the arrests, although it is flatly charged in the bill? Under such circumstances, the court must believe they will make the arrests unless restrained, and enjoin them accordingly. A contention like the present is fully answered

by the Supreme Court in Vicksburg Waterworks Co. v. Vicksburg, 185 U. S. 82, 22 Sup. Ct. 592, 46 L. Ed. 808, where it is said:

"It is further contended that the bill does not disclose any actual proceeding on the part of the city to displace complainant's rights under the contract, that mere apprehension that illegal action may be taken by the city cannot be the basis of enjoining such action, and that, therefore, the Circuit Court did right in dismissing the bill. We cannot accede to this contention. It is one often made in cases where bills in equity are filed to prevent anticipated and threatened action. But it is one of the most valuable features of equity jurisdiction to anticipate and prevent a threatened injury, where the damages would be insufficient or irreparable. The exercise of such jurisdiction is for the benefit of both parties—in disclosing to the defendant that he is proceeding without warrant of law, and in protecting complainant from injuries which, if inflicted, would be wholly destructive of his rights."

There is no real difference in principle between the injunctions issued on the original bill and those now prayed. The difference is of form only, in that the sheriffs and solicitors are made defendants by name in the amended bill, instead of being included, as in the original injunctions, under the designation, "other persons." The injunctions sought follow the lines the Supreme Court held proper in Reagan v. Trust Co., supra, and Smyth v. Ames, supra, both of which as to the nature of the specific relief granted went further in their terms in some respects than the injunctions now asked. Let an order be entered granting the preliminary injunction as to all the defendants who have been served, and fixing a further day as to the defendants who have been served.

The case made by the amended bill of the South & North Alabama Railroad Company is the same in its facts as that of the Louisville & Nashville Railroad Company. Like orders will be entered in it also.