WESTERN R. OF ALABAMA v. RAILROAD COMMISSION OF ALABAMA et al.   LOUISVILLE & N. R. CO. v. SAME.   CENTRAL OF GEORGIA RY. CO. v. SAME.   NASHVILLE, C. & ST. L. RY. CO. v. SAME.   SOUTH & NORTH ALABAMA R. CO. v. SAME.

(Circuit Court, N. D. Alabama, M. D.   July 7, 1909.)

1. COURTS (§ 508*)—JURISDICTION OF FEDERAL COURTS—SUSPENDING OPERATION OF STATE STATUTE.

Section 21 of the Declaration of Rights in the Constitution of Alabama, which provides that no "power of suspending laws shall be exercised except by the Legislature," does not affect the power of a federal court to enjoin the enforcement of a state statute adjudged to be in violation of the Constitution of the United States.

[Ed. Note.—For other cases, see Courts, Dec. Dig. § 508.*]

2. COURTS (§ 508*)—FEDERAL COURTS—PRIORITY OF JURISDICTION—ENJOINING PROCEEDINGS IN STATE COURTS.

Where a federal court has acquired exclusive jurisdiction to determine the constitutionality of a state statute establishing railroad rates and has granted a preliminary injunction restraining its enforcement pendente lite, it has power, on a proper showing, to enjoin the county solicitors, sheriffs, and clerks of the state courts from taking threatened action to institute and prosecute criminal and civil suits for violation of such suspended statute against the complainants in the federal suit.

[Ed. Note.—For other cases, see Courts, Dec. Dig. § 508.*

Enjoining proceedings in state courts, see notes to Garner v. Second Nat. Bank, 16 C. C. A. 90; Central Trust Co. v. Grantham, 27 C. C. A. 575; Copeland v. Bruning, 63 C. C. A. 437.]

In Equity.   On demurrers to supplemental bill.

This case is submitted on the demurrers to the supplemental bill by members of the Railroad Commission of Alabama, and the numerous parties defendant named as sheriffs, solicitors, and clerks of courts. The allegations

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

of the bill are fully set forth in the report of the cases under the style of the Louisville & N. R. Co. v. Railroad Commission of Alabama et al. (C. C.) 157 Fed. 944, and Central of Georgia Ry. Co. v. Railroad Commission of Alabama et al. (C. C.) 161 Fed. 925. The grounds of demurrer assigned are numerous; but the substance of them only need be here stated.

The demurrers by the commission challenge so much of the bill as seeks relief by enjoining the commission from reducing freight and passenger rates below those in force at the time of the commencement of the suit, on the ground that such relief "restrains legislative action on the part of the commission," and because the "statute conferring the power to reduce rates is a valid enactment of the state, and no facts are shown why the commission should be restrained pending the litigation." The members of the commission further demur to so much of the bill as seeks to have "superseded or suspended" the acts of the Legislature prescribing the rates complained of, on the ground that this court has no jurisdiction or power to "suspend or supersede an act of the Legislature of Alabama," and also "because the suspension of an act of the Legislature is a legislative and not a judicial function."

The defendants named in the bill as sheriffs, clerks of courts, solicitors, and deputy solicitors, and each class of state officers, separately and severally, demur to so much of the bill as seeks to enjoin their exercising their functions in performing their duties as officers of the state of Alabama, respectively, on the following grounds: They have no such connection with the enforcement of the statute as would justify making them parties defendant. The making of them such parties as representatives of the state is "an attempt to make the state a party defendant, and to sue the state in contravention to the eleventh amendment to the Constitution." Such injunction against the parties defendant as prayed by bill would amount to restraining the state courts from acting in cases brought before the courts, and amount to an injunction against action by the state grand juries; also, because "clerks of courts do not initiate civil or criminal proceedings, and perform their duties under the orders of the courts of which they are respectively clerks." They also demur to so much of the bill and prayer for injunction as seeks to restrain "all other executive and ministerial officers, state, county, and municipal, not specifically named in the bill, who are empowered to make arrests and execute warrants," etc., on the ground that it is not shown that the unnamed parties, not parties to the bill, bear any relation to or privity with, or are properly represented by, the officers named, and there is no allegation of conspiracy between the unnamed persons and those who are named as defendants.

Steiner, Crum & Weil and Geo. P. Harrison, for complainants.

Alex. M. Garber, Atty. Gen., H. C. Selheimer, and S. D. Weakley, for defendants.

JONES, District Judge (after stating the facts as above). Every question now raised by the demurrers, though then presented in a different mode, was decided adversely to the respondents in Central of Georgia Ry. Co. v. Railroad Commission of Alabama et al. (C. C.) 161 Fed. 925, and on appeal the Court of Appeals sustained this court's ruling upon the matters raised by the demurrer, except as to the injunction to prevent the commission from further reduction of the rates before the court, pending the final hearing.

The considerations which controlled this court in issuing that injunction were that as the statutes made the carrier's rates in force on January 1, 1907, the maximum rates thereafter, save wherein the eight group acts and the passenger statute reduced them, and complainant insisted on maintaining the rates it actually had in force when the suit was brought, and, further, that the statutory rates as a whole were unreasonable and confiscatory, necessarily any further re-

duction in those rates must present a controversy which inevitably was included in that already pending, and the exercise of the power to reduce rates, whatever the extent or nature of the reductions, could have no other effect than to raise in another form, without a particle of difference in substance, an issue which already formed a part of a controversy pending in the court, and could effect nothing more than to impede the court in the maintenance of the status quo which, by the other injunctions issued at the same time, this court had adjudged was the proper status to be observed and enforced pending final decree.

The other ground was: That the commission had no authority to reduce statutory rates, and therefore its action should be restrained, regardless of the reasonableness of the rates themselves. This view was reached on the conclusion that, the specific rates complained of being fixed by statute, the Legislature could not authorize an executive agency to change them, except upon the ascertainment by it of some state of facts which the Legislature itself set forth in the statute, upon the happening and finding of which the executive agency might then change the rates to the extent such statute provided; that the acts conferring power upon the commission to change the statutory rates did not thus provide, but, instead, merely authorized the commission to change the classifications and rates "from time to time, as conditions may in its judgment render it expedient or proper to do so"; and that, by thus leaving the whole matter in the uncontrolled and undefined discretion of the commission, the Legislature had attempted to delegate legislative power to the commission in violation of the state Constitution, as construed by its highest court.

The Circuit Court of Appeals did not take this view. It held the fair construction of the particular acts was that the rates fixed by the Legislature in the statutes were commanded to be enforced only until otherwise ordered by the commission, and that the Legislature must not be held, in granting the power to alter rates, to intend to confer any authority to be exercised at the mere will or caprice of the commission, but only to confer a power to be exercised reasonably, upon the ascertainment by the commission of such conditions as justly enter into the reduction or increase of rates, and hence had not attempted a forbidden delegation of legislative power.

The opinion of the Court of Appeals, however, did not pass upon what might be the duty or power of the court, if the commission acted unreasonably in the exercise of the power, making repeated orders, reducing specific rates, from time to time, while they are being contested and testimony is being taken, preparatory to final decree. It seems different principles would necessarily apply in a case of that kind, than where reductions are made by the Legislature itself pending contest of the particular rates before the court. The Legislature could not be made a party to a bill like this. Here the Railroad Commission is necessarily a party defendant, and occupies that relation, as well as the status of being the repository of the power to reduce rates from time to time. Taking into consideration this dual relation of the commission and the nature of the controversy, it would seem

inevitably to follow that a court of equity has the right to charge the conscience of a party before it not to exercise its power in such manner, in the preliminary stages of the litigation, as to oppress its opponent by changing the issue from time to time, with the further result of impeding the court in its efforts to bring the issues before it to final decision.

2. The demurrer to so much of the bill as seeks to have "superseded or suspended the acts prescribing the rates complained of," etc., on the ground that the "court has no power to suspend or supersede an act of the Legislature, which is a legislative and not a judicial function," must be overruled. Section 21 of the Declaration of Rights in the Constitution of Alabama, it is true, declares tht no "power of suspending laws shall be exercised except by the Legislature." The well-known history and intent of this constitutional provision make its meaning clear. It has no reference whatever to the admitted power and duty of the courts to annul and refuse operation to statutes which transgress the fundamental law. To hold otherwise would require the court to affirm that it had no power to arrest the execution of a statute, or limit or stop its operation, when it adjudged it to be unconstitutional —a power and duty which in this day is universally admitted, and now beyond the pale of controversy. Besides, the statutes here under review are assailed for violation of the Constitution of the United States, and no provision in a state Constitution can limit the extent of the judicial power of the United States in dealing with them, if found to violate the fundamental law.

The parts of the bill to which the demurrer relates seek, among other things, "a perpetual injunction, annulling and suspending the rates prescribed in the statutes hereinbefore recited," etc. If, on final proof, it be shown that the rates are unreasonable or confiscatory, it would be the duty of the court to prevent or enjoin the execution of the statutes, without prejudice to the right of the authorities, if subsequent conditions justified it, to seek to have the rates enforced in the future. Such, indeed, is the form and effect of the decree which the Supreme Court declares must be entered when the effect of a rate statute is adjudged unreasonable or confiscatory. It is perfectly accurate therefore, in law and common parlance, to declare that an act is "suspended or superseded" when such a decree is made. A statute, which is denied force until future events rightfully bring its power into play, is certainly "suspended and superseded," in the meantime. The allegations and prayer of the bill in this respect are not objectionable on any grounds, and in its last analysis the criticism now made of them has no stronger foundation than a play upon words. Plainly, a decision that a statute is unconstitutional, or that its operation upon a particular person is forbidden by the Constitution, and a consequent decree that it shall not be executed as to such person, is the exercise of the judicial, not of the legislative, function. The nature of that function is not changed, or converted into "the power of suspending a law," because the necessary result of declaring the act unconstitutional is to deny it force and operation. Besides, an unconstitutional enact-

ment is in no sense a law, and suspending or superseding its operation cannot therefore be an exercise of the "power of suspending laws."

3. The demurrer to so much of the bill as seeks to enjoin sheriffs, clerks of courts, and solicitors from making arrests, issuing summons and complaints, procuring indictments, and prosecuting and imprisoning defendant's servants, etc., must be overruled. Ex parte Young, 209 U. S. 123, 28 Sup. Ct. 441, 52 L. Ed. 714; L. & N. R. R. Co. v. Railroad Commission of Alabama et al. (C. C.) 157 Fed. 944. The necessity for making sheriffs, solicitors, and clerks parties is manifest from the allegations of the bill, which sets forth facts of which this court can take judicial knowledge, though not mentioned. Taylor v. Barclay, 2 Sim. 213. The Circuit Court of the United States, by the filing of the bills, had obtained exclusive jurisdiction to determine the reasonableness of the rates whose enforcement was contested, and every other matter, civil or criminal, which arose in the case regarding the enforcement or denial of the property right involved. No other court, state or federal, after that, could rightfully draw the same matter before it, no matter how attempted, and, by entertaining and deciding civil suits or criminal, for violations of the rate statutes, oust the jurisdiction of this court, and enable the defendants or any other persons to defy its orders, or punish the officers or servants of the carriers for doing that which the orders of this court adjudged they had a right to do.

The bill alleges positively: ' That the officers and servants of the carriers will be arrested, indicted, and prosecuted by the solicitors and sheriffs, and civil suits commenced, in every instance in which carriers depart from the tariff of rates fixed by the statutes; that such officers have threatened to issue summons and complaints, to procure indictments, and to arrest and imprison the defendant's servants, whereby the jurisdiction of this court will be ousted, and the very matter before it tried and determined in other courts, causing complainant to be subjected to a multiplicity of suits and irreparable damage, as well as inflicting great harm to the public, unless injunctions be issued against such action of the officers named. The bill also sets forth solemn public utterances of the highest executive officer of the state, to the effect that it was his duty to see that the officers sued out warrants, procured indictments, and made arrests, and imprisoned the officers and servants of the carriers, who did not observe the rate statutes, and that he would "so charge" them, notwithstanding this court had acquired exclusive jurisdiction of the case, and enjoined such conduct pending final action. If complainant has any right to be protected, certainly such allegations would entitle it to injunctive relief against such illegal acts.

There is no such difficulty on principle, as respondents suggest, to the court's enforcing the authority of the Constitution, and causing its commands to be respected and obeyed by executive officers in a case like this, whether they be clerks of courts, sheriffs, or solicitors. Dietzsch v. Huidekoper, 103 U. S. 494, 26 L. Ed. 497. Courts of equity, from time immemorial, have enjoined parties from prosecuting actions in the law courts, and such procedure, by its operation

upon the parties, as effectually prevents the law courts from trying the cases as if the injunction had included the law court by name. There must necessarily be an actor, a res, and a judex before a judgment can be rendered. If the actor is silent, or prevented from presenting his case, there can be no trial or judgment. Nowadays, it is settled, whatever may have been the contention in the earlier days, that such orders of the court of equity do not imply any superiority over the law court, and are not invasive of its jurisdiction, or in any wise improper. Even after solemn trial and judgment in the law court, the court of equity, operating in personam upon the parties, may arrest the execution of the judgment, and decree that it be held for naught, if the equity of the case requires. That a court of equity may control a ministerial officer as well as a party, either before or after the illegal act, in order to prevent it, or undo its effects, is not matter of dispute in this day. What difference is there in principle between preventing a mere ministerial officer, in advance, from doing the illegal act to bring before the law court matters which ought not to be brought there, since the questions to be tried have fallen within the exclusive jurisdiction of another court, and laying hands upon the ministerial officer after the law court has passed upon such matters and preventing the ministerial officer from carrying the judgment into effect? Interference in the first, rather than in the last, stage, would seem to be the better course. The fourteenth amendment denies to any agency of the state the power to accomplish the result it forbids. All courts, state as well as federal, in order to enforce the Constitution, must control every agency sought to be illegally used, in the name of the state, to deprive any one of life, liberty, or property without due process of law, or in any other manner to evade the supremacy of the Constitution, or laws. "Where the end is required, the means are given."

Ordinarily, it is not customary or needful to make executive officers of a court parties to injunction suits. If the parties before the court obey the injunction, no order can result or process issue, which the officer will be called upon to enforce. In that event, there is no necessity to deal with the ministerial officer at all. There are, however, numberless cases where the relief sought involves the staying of the execution of alleged invalid statutes, under which officers, though not interested in the property right asserted and denied in the litigation. claim and insist that they have duties to perform in the execution of the statute called in question, and in consequence take, or threaten to take, action, which does or will inflict irreparable injury to the property rights of complainant, and interfere with the jurisdiction of the court which has first undertaken to adjudge the matter in dispute. Whenever that is the case, it is proper to make such officials parties, and to order their conduct just as the court would in the case of a person directly interested in the right asserted in the suit; this no more "enjoining the court itself" than an injunction which forbids parties to prosecute suits therein, or an injunction, after the case has been tried and judgment rendered, preventing execution, which can be ordered whenever essential to the ends of justice.

The injunction originally issued on this point, and which it may become the duty of the court to reinstate on the final hearing, if the ultimate proof establishes the right contended for, neither invades nor interferes with the jurisdiction of any other court. In this particular case, the penalty provisions of the statutes are void, and the civil suits, the bringing of which is sought to be enjoined, are not proper to be brought in state courts, regardless of the reasonableness of the rates, since the bringing of them there to enforce those rates is an interference with the exclusive jurisdiction which the Circuit Court has already acquired to adjudge and settle those very matters. The injunction does not stay the judicial hand itself, in any event. The grand jury is left free to find indictments. The law court, if it so chooses, may try the indictments. The solicitor, however, who prosecutes, the sheriff who arrests, and the officer who issues the capias, each does so at his peril. Thereby they wrongfully put state power in motion to accomplish ends which the Constitution forbids the state and its agencies combined from effecting, when they will result in irreparable injury to rights given or secured by the Constitution, and violate rightful orders of a court which has obtained exclusive jurisdiction of the entire question. The officials thus enjoined were simply prevented from exercising ministerial power, as to matters with which they were no longer concerned, matters as to which they were not only under no duty to act but, on the contrary, were under the highest duty to refrain from undertaking anything. The injunction operates only in personam upon the officer, and does not touch the court.

There is no sanctity about the office of a clerk of a court which forbids that he be restrained from issuing process, which will result in a multiplicity of suits and irreparable injury, any more than in the case of any other ministerial officer whose acts may effect a like result. It is not to be presumed that any court will instruct its ministerial officer to meddle with matters which have already been drawn into the exclusive jurisdiction of another court, if advised that such is the case. In such event, it would be the plain duty of the court to instruct its clerk to obey the injunction issued against him by the court having exclusive jurisdiction of the matter. The court itself, whose clerk was enjoined, would have no power to invade the jurisdiction of the other court, much less the right to instruct a subordinate ministerial officer, in violation of an injunction, to issue summons and complaints or capiases to bring before the court matters which it could not determine, without usurping the exclusive jurisdicdiction of another court. Peck v. Jenness, 7 How. 612, 12 L. Ed. 841; Covell v. Heyman, 111 U. S. 176, 4 Sup. Ct. 355, 28 L. Ed. 390. The consideration which state and federal courts owe to each other, in the exercise of their respective jurisdictions, in order to prevent conflicts, is based upon something stronger than mere courtesy, and has become "a principle of law and right, and therefore of necessity." The duty of a court not to attempt to exercise jurisdiction over matters over which another court has taken jurisdiction is as obligatory upon courts as any other duty imposed upon them. The whole matter of those suits and arrests having been withdrawn from the jurisdiction of the

state court, its clerk and officers had no functions to perform in reference to them, and no discretion to exercise relative thereto. The state court, in view of these well-settled principles, would be bound to advise its clerk, if he applied for directions, to observe the injunction. There is no room therefore, if the Constitution and laws be obeyed, as it must be presumed they will be obeyed by every court, for conflicting directions from the different courts to the ministerial officer. The directions of the federal court to the clerk to refrain from acting as to matters with which he no longer has duties or concern derogate in no way from the dignity of the state court, or its proper control over its own officer, and is not provocative of conflict. The directions given the clerk simply subordinate him to the operation of the Constitution and laws in a particular case, from which no court, which maintains its allegiance to the supreme law, would seek to free him. The fact therefore that "the clerk performs his duties under the direction of the court" is not of the slightest importance in determining the propriety of issuing an injunction against the clerk.

It is common practice for courts of equity, in order to prevent irreparable injury, to restrain clerks and ministerial officers from certifying to facts or doing ministerial acts which will put in motion a train of illegal consequences. In Reagan v. Farmers' Loan & Trust Co., 154 U. S. 362, 14 Sup. Ct. 1047, 38 L. Ed. 1014, the Supreme Court affirmed an injunction which prevented the Railroad Commission from certifying any copy or copies of a tariff, or delivering a certified copy thereof to the Attorney General of the state. A like order, in principle, was approved by that court in Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418; 42 L. Ed. 819. Other striking instances of the approval by the Supreme Court, of the exercise of the power, in cases like this, to enjoin court officers and other executive agencies, are to be found in Re Tyler, 149 U. S. 164, 13 Sup. Ct. 785, 37 L. Ed. 689; Pennoyer v. McConnaughy, 140 U. S. 1, 11 Sup. Ct. 699, 35 L. Ed. 363; Prout v. Starr, 188 U. S. 537, 23 Sup. Ct. 398, 47 L. Ed. 584; Ex parte Young, 209 U. S. 123, 28 Sup. Ct. 441, 52 L. Ed. 714. If, as these cases hold, the Governor, the Attorney General, and the constable may properly be made parties to the suit, and enjoined, by what system of logic can it be held that it is improper to make defendants of sheriffs, solicitors, clerks, and executive officers of any kind, and enjoin them, when necessary to prevent irreparable injury to a property right, secured or guaranteed by the Constitution?

The relief prayed in these cases on this point was necessitated by the anomalous condition of affairs brought about by the vain device of stripping state officers of the power to enforce the rate enactments, in order to defeat the jurisdiction of this court to pass upon the reasonableness of the rates involved, and yet, at the same time, practically lodging the power of the state in the hands of every private citizen to inflict injury upon the property right asserted, which, when attempted by the official in the name of the state, it was admitted the Constitution forbids, and which the Supreme Court held could be arrested by enjoining the official, whenever the power and duty were

put upon him to execute the statute. What the state cannot effect directly, it cannot effect indirectly.

It is always sufficient, to warrant the making of an officer a defendant and enjoining him, that he has it in his power to inflict irreparable injury upon complainant, and has threatened to do so, and will do so, unless enjoined. The power to inflict the injury, and the fact that the party is "about" to do so, and will do so, unless enjoined, constitute all the "relations" of the officer to the statute which is required to make him a defendant to an injunction suit. The public—that is, all the persons having the right to demand transportation service at the hands of the carriers at the rates fixed by the statutes—are parties to a suit to annul these statutes, by representation, through the rate making officials with whom the carrier contests the rates in the courts. "The public," which includes numberless thousands of individuals, cannot be specifically named in the bill for injunction. By well-known rules of equity practice, certain persons may be selected as representatives of a particular class and made defendants, and injunctions awarded against them, and all others similarly situated, if the justice of the case requires it. The right of complainant to relief of this sort, if the case entitles him to it, cannot be effectually enforced in any other way.

"The same considerations apply to the relief sought against all other executive and ministerial officers, not specifically named, who are empowered to make arrests," etc. It is not objectionable, because it does not appear that "those unnamed parties are in privity with or properly represented by the officers named, and there are no allegations of conspiracy between them," etc. They are of the same class, have the same power, and are charged with the same intent to make arrests, etc., and the same relief is sought against them as against the individual officers who are made defendants. "Attempting to make them parties" in the manner stated hampers no defense, nor interferes with any right of the demurrants. If therefore such practice be improper, which is not decided, it is of no concern to respondents. The question could become material only in event some of the designated classes, not made a party defendant by name, should disobey the orders of the court and be called to account therefor.

There is nothing of substance in the contention that these bills are in reality suits against the state, if such injunctions are allowed against officers of the state courts, or other executive officers, to prevent their participating in the bringing and prosecution of criminal proceedings to enforce the execution of the rate statutes. Repeated and solemn decisions of the Supreme Court of the United States, time and again, have adjudged that such suits and injunctions are not suits against the state, and are not improper in themselves. The Supreme Court is the final arbiter of such questions. Respect for its decisions forbids any other court to treat the question as longer open to contestation. The contrary insistence, however, is again urged here. It is no longer to be disputed that, under our jurisprudence, neither state nor federal government has any power beyond the limitations which the state and federal Constitutions place upon their authority; and whenever the

Legislature of a state, or Congress, attempts to go beyond these limitations, their enactments are nullities, and those who attempt to execute them are mere trespassers. The legislative power having no authority to speak for the state or the United States, beyond the limits of the power assigned, its enactments, when they transgress in this respect, do not speak the will of the state or of the United States, and are not their act or deed in any sense. Denying force to such legislative excesses impairs no power or right of the state. It merely prevents an illegal, individual aggression, in its name, which it did not command, and could not authorize.

As said in Re Ayers, 123 U. S. 433, 8 Sup. Ct. 164, 31 L. Ed. 216, if the individual, acting under the assumed authority of the state and under the color of its laws, "comes in conflict with the commands of the Constitution of the United States, he is stripped of his representative character and subjected in his person to the consequences of his individual conduct." If the suitor or person whose property rights are assailed and threatened with irreparable injury, under the guise of enforcing an unconstitutional enactment, could not resort to equity in the first instance to prevent such wrong, but must simply stand on the defensive and wait until he is illegally assailed, and it may be irreparably injured, many of the most sacred constitutional safeguards for the protection of the liberty and property of the citizen, against invasion under the forms of law, would be practically nullified, and in many cases he would stand as defenseless as though the Constitution had not at all provided for his protection. Helpless and pitiable indeed would be the plight of the citizen, if such a suit against officers, asking preventive relief, in advance, to forbid their enforcing an unconstitutional statute to the irreparable injury of a property right, be a suit against the state, which the citizen cannot maintain in any court without its consent. Acceptance of such a doctrine would prevent the enforcement of the checks and limitations imposed upon the several departments of government for the protection of the life, liberty, and property of the citizen. It is in plain hostility therefore to our whole scheme and purpose of constitutional government. It goes further than the old doctrine that, "The king can do no wrong," which never denied the right to call his officer or agent to account, and invests the officer or agent with prerogatives and immunities, which, even in monarchial governments, are never extended save to the king himself.

There is no affidavit that the demurrers are not interposed for delay. It was stipulated, however, in open court, with its approval, since the defendants were numerous, and delay would ensue in procuring their affidavits and getting the cases at issue, that no objection would be taken because of the absence of such affidavits.

The several demurrers must be overruled, with the single exception of that relating to future reductions of rates by the commission, which is sustained. The parties having agreed upon the time in which the answers will be filed, no order will now be made in that regard.

The cases of the Louisville & Nashville Railroad Company, the Central of Georgia Railway Company, the Nashville, Chattanooga & St. Louis Railway Company, and the South & North Alabama Rail-

road Company were submitted with this case, upon like demurrers to the supplemental bills, and the same orders will be entered in them as in this case.